**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FEDERAL HOUSING FINANCING AGENCY, on its own behalf and as conservator of Fannie Mae and Freddie Mac,      ) ) ) ) ) |  |
| Plaintiff,     ) ) | No. 11 C 8795 |
| v.     ) ) | Judge Thomas M. Durkin |
| CITY OF CHICAGO,     ) ) |  |
| Defendant.     ) |  |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Federal Housing Financing Agency ("FHFA") brought this lawsuit on its own behalf and on behalf of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") against Defendant City of Chicago. R. 1. FHFA alleges that an ordinance passed by the Chicago City Council in July 2011 unlawfully regulates FHFA, Fannie Mae, and Freddie Mac in their capacity as mortgage investors and mortgagees.[1] In particular, the ordinance requires FHFA to file a registration statement with the City of Chicago's Department of Buildings for each "vacant" building for which FHFA is a mortgagee, and maintain the buildings in accordance with certain standards set forth in the ordinance. Two motions are presently before the Court: the City's motion to dismiss, R. 24, and FHFA's cross-motion for summary judgment. R. 34. The City's motion is denied, and FHFA's motion is granted, because the ordinance is

---

[1] For ease of reference, the Court primarily refers to the three entities as "FHFA" unless otherwise noted.

preempted by the Housing and Economic Recovery Act, and, alternatively, violates FHFA's immunity from taxation.

## I. Background

FHFA is an independent federal agency created under the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654, *codified at* 12 U.S.C. § 4511, *et seq.* Fannie Mae is a corporation chartered by Congress to "establish secondary market facilities for residential mortgages," "provide stability in the secondary market for residential mortgages," and "promote access to mortgage credit throughout the Nation." 12 U.S.C. § 1716. Freddie Mac is also a corporation chartered by Congress for substantially the same purposes as Fannie Mae. *Id.* § 1451. "Fannie" and "Freddie," as they are commonly called, "buy residential mortgages from banks, repackage them for sale as mortgage-backed securities, and guarantee these securities by promising to make investors whole if borrowers default." *Judicial Watch, Inc. v. FHFA*, 646 F.3d 924, 925 (D.C. Cir. 2011) (citing CONG. BUDGET OFFICE, "Fannie Mae, Freddie Mac, and the Federal Role in the Secondary Mortgage Market" (Dec. 2010) at viii). Fannie and Freddie "play an important role in the national housing market by making it easier for home buyers to obtain loans." *Judicial Watch*, 646 F.3d at 925.

In September 2008, FHFA exercised its power under HERA to place Fannie and Freddie into conservatorships "for the purpose of reorganizing, rehabilitating, or winding up [their] affairs." 12 U.S.C. § 4617(a)(2) ("[FHFA] may, at the discretion of the Director, be appointed conservator or receiver for the purpose of reorganizing,

rehabilitating, or winding up the affairs of a regulated entity."). FHFA was appointed conservator and, as such, succeeded "to all rights, titles, powers, and privileges of [Fannie and Freddie]." *Id.* § 4617(b)(2)(A)(i). As conservator, FHFA is authorized to "take over the assets of and operate [Fannie and Freddie] with all the powers of the shareholders, the directors, and the officers of [Fannie and Freddie]" and "preserve and conserve the assets and property of [Fannie and Freddie]." *Id.* §§ 4617(b)(2)(A)(i), (B)(i), (B)(iv).

According to FHFA's complaint in this case, FHFA issued a directive to Fannie and Freddie in April 2011 to implement consistent mortgage loan servicing and delinquency management requirements. R. 1 ¶ 26.[2] Subject to the supervision of FHFA, Fannie and Freddie contract with numerous servicers who perform activities such as collecting and delivering principal and interest payments, administering escrow accounts, monitoring and reporting delinquencies, and performing default prevention activities. *Id.* ¶ 27. Servicers must comply with various requirements set forth in agreements they have with Fannie Mae and/or Freddie Mac. *Id.* ¶ 28.

In its complaint, FHFA cites a Fannie Mae Servicing Guide announcement dealing with property maintenance that was issued on September 2, 2011, shortly

---

[2] This allegation—like many others set forth in the background section of this opinion—is also included in FHFA's Local Rule 56.1 statement of material facts submitted in support of FHFA's cross-motion for summary judgment. *See* R. 35. The City does not admit or deny many of FHFA's statements, contending that it "lacks information needed to respond . . . and requires further discovery to address" the assertions. *See, e.g.*, R. 39 ¶¶ 9, 10, 15-17.

before this lawsuit was filed. *Id.* ¶ 29.[3] The announcement provides, for example, that if a mortgage loan is delinquent, the servicer must order a property inspection no later than the 45th day of delinquency, and the property must be inspected no later than the 60th day of delinquency. Pursuant to the announcement, the servicer must continue to obtain property inspections every 30 days as long as the mortgage loan remains delinquent for 45 days or more. *Id.* The Freddie Mac Servicing Guide imposes the same requirements. *Id.* FHFA attaches portions of Fannie and Freddie's Servicing Guides to its motion for summary judgment. *See* R. 36-4; R. 36-5. Both guides advise servicers to consult Fannie's and Freddie Mac's reimbursement provisions for the allowable amounts for property preservation work. Servicers are directed to "take whatever action is necessary to protect the value of the property" and perform property maintenance "[t]hroughout the foreclosure process." R. 36-4 § 108.

As of October 2011, Fannie and Freddie, combined, owned approximately 258,000 loans that are secured by properties located in the City of Chicago. Fannie Mae owned approximately 156,000 loans that are secured by properties in Chicago. R. 1 ¶ 30. Freddie Mac owned approximately 102,000 loans that are secured by properties in Chicago. *Id.* ¶ 31. Fannie and Freddie each use approximately 200 servicers in connection with those loans. *Id.* ¶¶ 30-31.

In July 2011, the Chicago City Council passed an ordinance that amended Chapter 13-12 of Chicago's Municipal Code regarding vacant buildings (the

---

[3] Citing Announcement SVS-2011-08R, *available at* https://www.fanniemae.com/content/announcement/svc1108.pdf.

"Ordinance"). *Id.* ¶ 18. The Ordinance, which became effective November 19, 2011, added a section requiring "mortgagees" to file a registration statement for each "vacant" building with Chicago's Department of Buildings 30 days after a property becomes vacant or 60 days after a default on a mortgage, whichever is later. *Id.* ¶¶ 18-19 (citing Municipal Code of Chicago § 13-12-126(a)(1)). Prior to the amendment, the Ordinance required only *owners* of vacant buildings to file a registration statement. Now the Ordinance requires "mortgagees" to register and pay the $500 base registration fee in the event the owner does not register the building.[4] The registration remains valid for six months from the date of registration.

The Ordinance defines "mortgagee" as "(A) the holder of an indebtedness or obligee of a non-monetary obligation secured by a mortgage or any person designated or authorized to act on behalf of such holder, (B) any person claiming through a mortgagee as successor, and (C) any person identified as such in a recorded document which has not been released, assigned, or superseded of record." Municipal Code of Chicago § 13-12-126(e)(4). FHFA alleges that it qualifies as a "mortgagee" under the Ordinance. "Vacant" means both uninhabited and "in need of maintenance, repair or securing." *Id.* § 13-12-126(e)(5).

---

[4] In situations where Fannie and Freddie have foreclosed on a property and thereby become the "owner" of the property, FHFA represents that it complies with the section of the Ordinance that relates to owners of vacant buildings, or § 13-12-125. R. 77 (June 19, 2013 Hearing Transcript) at 26. FHFA's obligations as an "owner" are not part of this lawsuit. *See* R. 52 at 2 ("[T]he Conservator does not claim that HERA preempts the City's regulation of how an owner uses land."). That said, FHFA maintains that it cannot be financially penalized under either section of the Ordinance—regardless of whether it is an "owner" or "mortgagee"—because any fees assessed under the Ordinance are unlawful taxes. R. 77 at 26. That allegation is not included in FHFA's complaint, and, thus, the Court expresses no opinion on it.

Once a vacant building is registered, the Ordinance requires the mortgagee to renew the registration for successive six-month periods as long as the building remains vacant. *Id.* § 13-12-126(a)(1). There is no fee for mortgagees to renew the registration. *Id.* The Ordinance also requires mortgagees of vacant buildings to secure and maintain the buildings in accordance with the standards set forth in the Ordinance. *See id.* § 13-12-126(b). For instance, the mortgagee is responsible for securing the building's doors and windows, maintaining all grass and weeds, clearing snow from the walkway and any public sidewalk adjoining the lot, and affixing a sign to the building that indicates the building's registration number and other information. *Id.* The Ordinance provides that violators shall be fined between $500 and $1,000 for each offense. *Id.* § 13-12-126(c).

FHFA seeks a declaratory judgment that it is exempt from the Ordinance, as well as an injunction against enforcement of the Ordinance against Fannie Mae, Freddie Mac, and/or those that are acting on their behalf (*e.g.*, FHFA). *See* R. 1. The City moved to dismiss the case pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 17. R. 24. FHFA filed a consolidated response to the City's motion and a cross-motion for summary judgment. R. 34. On June 19, 2013, the parties appeared for oral argument.

## II. City of Chicago's Motion to Dismiss

The City raises four arguments in support of its motion to dismiss. R. 25-1 at 4. First, the City contends that FHFA's claims should be dismissed under Rule 12(b)(1) for lack of ripeness. Second, the City argues that the Court lacks subject

6

matter jurisdiction over FHFA's complaint, and the complaint violates Rule 17 because only the Director of FHFA is authorized to initiate litigation and the current Acting Director of FHFA was not validly appointed. Third, the City contends that FHFA's claims should be dismissed under Rule 12(b)(6) because 12 U.S.C. § 4617, the statute on which FHFA relies for preemption, does not apply to municipalities and, even if it did, Congress did not intend for the federal statute to preempt local land use regulations such as the Ordinance. Finally, the City argues that FHFA's claim that the $500 registration fee violates its immunity to state and local taxation should be dismissed.

Because the City's first two arguments relate to whether this case is properly before the Court, the Court will address those issues first. The City's latter two arguments, which are also the subject of FHFA's motion for summary judgment, will be addressed in Part III of this opinion.

### A. Ripeness

"Inquiries into ripeness generally address two factors: first, whether the relevant issues are sufficiently focused so as to permit judicial resolution without further factual development; and, second, whether the parties would suffer any hardship by the postponement of judicial action." *Triple G Landfills, Inc. v. Bd. of Comm'rs of Fountain Cnty.*, 977 F.2d 287, 288-89 (7th Cir. 1992).

Here, the City argues that this case is not ripe for adjudication because FHFA's claims rest on a series of "'contingent future events that may not occur as anticipated or, indeed, may not occur at all.'" R. 25-1 at 8 (quoting *Texas v. United*

*States*, 523 U.S. 296, 300 (1998)). The City lists a series of events that it contends must occur before the Ordinance will be applied to mortgagees. Specifically, the City asserts that: "(1) the property must become 'vacant' within the special, narrow meaning of the Ordinance; (2) the owner must fail to register it with the City's Department of Buildings; and (3) the mortgage loan must be in default for at least 60 days." R. 25-1 at 6 (citing Municipal Code of Chicago § 13-12-126(a)(1)). Further, even if the property is "vacant," the Ordinance will not necessarily apply because FHFA and/or the servicers may be in compliance with the Ordinance, thus not warranting any action by the City. The City argues this is especially true because Fannie and Freddie have their own servicing guidelines that impose similar requirements as the Ordinance. *See* R. 77 at 21.

FHFA responds that this action is ripe because the Ordinance clearly applies to FHFA as a "mortgagee."[5] R. 36 at 22. FHFA argues that the law does not require a party who "falls within the intended scope of a statutory enforcement regime" to "wait for the statute to be applied or enforced." *Id.* FHFA points out that the City has failed to disavow enforceability of the Ordinance. *Id.* at 23. At oral argument, the City confirmed that it intends to enforce the ordinance against FHFA. R. 77 at

---

[5] The parties do not dispute that Fannie and Freddie constitute "mortgagees" under the Ordinance, but the City disputes that FHFA does. The City argues that *FHFA* is not a "mortgagee" because "HERA does not authorize FHFA to buy and sell mortgages, and FHFA has not alleged that any of Fannie's or Freddie's mortgages have been transferred to it or recorded in FHFA's name." R. 56 at 4 n.1. But, as conservator, FHFA steps into the shoes of Fannie and Freddie and immediately succeeds to all of their assets. *See* 12 U.S.C. § 4617(b)(2)(A)(i). Thus, FHFA is a mortgagee.

23-24.[6] Moreover, FHFA contends that it has already been harmed by the Ordinance because it must reimburse servicers that have made vacant property registration payments to the City "under protest." R. 53-1 ¶ 2; R. 53-2 ¶ 4.[7] FHFA asserts that its own mortgage servicing guidelines afford sufficient maintenance and protections for buildings for which FHFA is a mortgagee. FHFA contends that the Ordinance is more demanding, and that it is more costly for FHFA to comply with the Ordinance's requirements—as opposed to following the servicing guidelines promulgated by FHFA. R. 77 at 38.[8] In any event, regardless of whether FHFA's guidelines or the City's guidelines are more onerous, the Ordinance requires FHFA to pay the registration fee, something it would not otherwise be required to pay.

---

[6] An admission "at oral argument is a binding judicial admission, the same as any other formal concession made during the course of proceedings." *McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 680 (7th Cir. 2002). Such admissions are properly considered on a motion to dismiss. *Cf. Mopex v. Barclays Global Investors*, 2003 WL 880996, at *2-3 (N.D. Ill. Mar. 5, 2003) (holding that a representation in memorandum of law in opposition to motion to dismiss constituted a judicial admission); *Chow v. Aegis Mortg. Corp.*, 185 F. Supp. 2d 914, 916 (N.D. Ill. 2002) (holding that a concession in an opposition to motion to dismiss constituted a judicial admission).

[7] The Court considers these declarations in order to determine whether this case is properly before the Court, despite their being outside the pleadings. *See Hay v. Ind. State Bd. of Tax Comm'rs*, 312 F.3d 876, 879 (7th Cir. 2002) ("[T]he district court had not only the right, but the duty to look beyond the allegations of the complaint to determine that it had jurisdiction to hear the [plaintiffs'] claim."). Although the Seventh Circuit has explained that ripeness is not a question of jurisdiction but concerns "the appropriate exercise of [a court's] discretion," *Brandt v. Vill. of Winnetka, Ill.*, 612 F.3d 647, 649 (7th Cir. 2010), questions of ripeness and jurisdiction both concern whether a case is properly before a court making it appropriate for the Court to consider matters outside the pleadings here.

[8] FHFA further stated that even if the Ordinance required *less* cost and/or maintenance than FHFA's guidelines, there would still be objectionable preemption to the extent that the City is regulating FHFA. R. 77 at 41.

According to Freddie Mac's Senior Manager of the Recovery & Property Preservation Units, as of May 2012, there were at least eleven properties for which servicers paid registration fees on behalf of the mortgagee, Freddie Mac. *See* R. 53-2 ¶ 3. Freddie Mac "either has reimbursed or will reimburse the servicers for these registration payments, as the servicing agreements require." *Id.* ¶ 4. In other words, Fannie and Freddie are contractually obligated to pay the registration fee pursuant to agreements they have with servicers. At oral argument, the Court inquired whether the reimbursements had, in fact, occurred and, if so, how many times. R. 77 at 44. Counsel for FHFA could not provide a precise number, but represented that "payments *are* being made as a result of the ordinance" and that FHFA has had to reimburse servicers "more than a few times, a significant number of times." R. 77 at 44, 47 (emphasis added).

The City maintains that the mortgages are recorded in the names of the servicers, and thus the ordinance is not being enforced against FHFA, Fannie Mae, or Freddie Mac. R. 37 at 4-5. This argument puts form over substance. The Court agrees with FHFA's position that even though, for instance, Freddie Mac is not the registered mortgagee, if Freddie Mac is reimbursing its servicers after the servicers register and pay the City's fees, then the suit is ripe. *See* R. 60 at 2-3. The servicer is registering the mortgaged property on behalf of Fannie Mae and Freddie Mac. In other words, the City requires servicers—and, through them, FHFA—to register the building, pay registration fees, and maintain them under the standards set forth in

the Ordinance, or face the consequences of noncompliance (*e.g.*, additional fines and penalties).

In *American Trucking Associations v. City of Los Angeles*, the defendant unsuccessfully argued (in the context of preemption) that its tariff did not impose criminal sanctions on the plaintiff—a national trade association representing the trucking industry—but rather only directly applied to the terminal operators who were responsible for granting or denying trucks access to the Port of Los Angeles. 133 S. Ct. 2096, 2103 (2013). The Supreme Court "fail[ed] to see why the target of the sanctions makes any difference" because the defendant acted with the "force of law" when it "required terminal operators, on pain of criminal penalties, to insist that the truckers [comply with the tariff's requirements]." *Id.* at 2104. *American Trucking* discredits the City's argument that its ordinance is limited to servicers alone. Even if the Ordinance is, on its face, only directly applicable to servicers, *American Trucking* holds that the Court's analysis is not confined to one level of the "same supply chain" in deciding whether the Ordinance is preempted.

Here, FHFA alleges that the City has collected money from FHFA pursuant to the Ordinance, and that FHFA is "entitled to the immediate refund of all amounts paid, and reimbursement of costs incurred, under or as a result of the Ordinance." R. 1 ¶¶ 96-97. FHFA has also submitted a sworn affidavit from one of Freddie Mac's senior managers attesting that Freddie Mac has reimbursed servicers for registration payments made to the City. This is not a case that "rests upon contingent future events that may not occur as anticipated, or may not occur at all."

*Harris v. Quinn*, 656 F.3d 692, 700 (7th Cir. 2011). FHFA alleges that it made payments as a result of the Ordinance, and the City refuses to exempt vacant buildings from compliance with the Ordinance where the mortgages are owned by Fannie Mae and Freddie Mac. In fact, during the oral argument before this Court, the City's counsel admitted that "it is our intent to enforce [the Ordinance]" against FHFA. R. 77 at 23. Accordingly, the Court concludes that FHFA's claims are ripe and properly before the Court.

### B. Standing

The City's next argument relates to whether FHFA has authority to bring this lawsuit. R. 25-1 at 9. The City argues that HERA does not authorize FHFA to sue—rather, only a valid Director of FHFA has statutory authority to bring a lawsuit on behalf of FHFA.[9] The City contends that the current Acting Director of FHFA, Edward DeMarco, was not validly appointed because FHFA's first director (James Lockhart) was not validly appointed when FHFA was created out of the Office of Federal Housing Enterprise Oversight ("OFHEO")). Thus, the City concludes, since there has *never* been a validly-appointed FHFA Director, this suit is not properly brought because Acting Director DeMarco can only stand in for a lawfully appointed Director. Accordingly, the City claims that this case must be dismissed under Federal Rule of Civil Procedure 17(a)(1), which requires an action to be "prosecuted in the name of the real party in interest."

---

[9] The City wisely does not spend much time on the issue of whether technically FHFA or the Director of FHFA should be named as the plaintiff in this matter because, as the City's counsel acknowledged at oral argument, "that's something that can be corrected"—*i.e.*, via an amended complaint. *See* R. 77 at 10. The heart of the dispute, in the City's view, is whether a Director has been validly appointed under HERA.

The City points to the statutory language of HERA as support for its argument that there has never been a valid Director of FHFA. R. 25-1 at 9-11 (citing 12 U.S.C. § 4512). HERA provides that "[t]he Director shall be appointed by the President, by and with the advice and consent of the Senate." 12 U.S.C. § 4512(b)(1). In light of recent case law from the Second Circuit,[10] the parties submitted supplemental briefs on the issue of whether Lockhart's and DeMarco's appointments were valid. *See* R. 47, 49, 50, 64, 66. In its supplemental briefs, the City emphasized that its argument is *statutory* in nature, and thus attempts to distinguish this case from the Second Circuit's decision that Lockhart's appointment was *constitutional* and did not run afoul of the Appointments Clause of the Constitution.[11] R. 66 ¶¶ 10-11 (citing *UBS Americas*, 712 F.3d at 144); *see also* R. 49 ¶ 2 (arguing that *UBS Americas*, 858 F. Supp. 2d 306, is irrelevant and "misleading because it addresses an argument the City did not present").

In essence, the City contends that allowing Acting Director DeMarco to bring a lawsuit on behalf of FHFA violates HERA. The City focuses on HERA's "transitional provision," § 4512(b)(5), which provided that James Lockhart, as the "person serving as Director of [OFHEO] . . . shall act for all purposes as, and with

---

[10] After briefing on the City's motion to dismiss concluded, the Southern District of New York decided *Federal Housing Finance Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 322 (S.D.N.Y. 2012), which addressed whether Lockhart was validly appointed as Director of FHFA. The court held that Lockhart's appointment was constitutional, and FHFA had standing to bring the action against UBS. *Id.* The Second Circuit affirmed the district court's decision. *See Federal Housing Finance Agency v. UBS Americas, Inc.*, 712 F.3d 136, 144 (2d Cir. 2012).

[11] The Appointments Clause grants the President the power to "nominate, and by and with the Advice and Consent of the Senate, . . . to appoint . . . Officers of the United States." U.S. Const. art. II, § 2.

the full powers of, the Director [of FHFA]" during the period of time when Congress essentially converted OFHEO into FHFA. 12 U.S.C. § 4512(b)(5). Pursuant to the statute, Lockhart's tenure as "the person with the full powers of[] the Director" expired on the date "the Director is appointed and confirmed." *Id.* The City argues that by including this section in HERA, Congress intentionally chose not to make Lockhart the new Director or Acting Director of FHFA because it would violate the Appointments Clause.[12] R. 25-1 at 10-11; R. 37 at 7 n.8. Moreover, the City contends that DeMarco's current position as Acting Director is invalid because, under HERA, the Deputy Director only becomes Acting Director in the event of the death, resignation, sickness, or absence of the Director." 12 U.S.C. § 4512(f).

As noted above, the City argues that this case is distinguishable from *UBS Americas* because the Second Circuit did not specifically consider §§ 4512(b)(1) and (b)(5) of HERA in the context now advanced by the City. But this is a distinction without a real difference. The Court agrees with FHFA that the issues addressed in *UBS Americas* carry over and apply to the present dispute. After evaluating the district court's "thorough and carefully considered opinion and order," the Second Circuit held that "Lockhart was legally the Director" of FHFA, and, after Lockhart resigned from the position, "DeMarco was properly designated by the President as Acting Director of FHFA." *UBS Americas*, 712 F.3d at 140, 144.

This Court, too, has examined the district court's reasoning in *UBS Americas*, and finds it to be persuasive. Indeed, as the City points out, § 4512(b)(1) requires the Director to be appointed by the President, by and with the advice and consent of

---

[12] The City does not point to any legislative history to support its contention.

the Senate. In *UBS Americas*, the defendant argued that the "transition provision" set forth in § 4512(b)(5) violates the Appointments Clause, which, like § 4512(b)(1), requires officers like Lockhart to be appointed by the President and confirmed by the Senate. 858 F. Supp. 2d at 322. The district court in *UBS Americas* held that Lockhart—who, at the time, was the Presidentially-appointed and Senate-confirmed Director of OFHEO—did not require a second appointment to "act . . . with the full powers of[ ] the Director [of FHFA]." *Id.* Indeed, "[i]t is well established that Congress may confer on validly appointed officers 'additional duties, germane to the offices already held by them . . . without thereby rendering it necessary that the incumbent should be again nominated and appointed.'" *Id.* (quoting *Shoemaker v. United States*, 147 U.S. 282, 301 (1893)). Like the defendant in *UBS Americas*, the City does not argue that the additional powers that HERA assigned to the Director of FHFA were not "germane" to those that Lockhart was already performing as the Director of OFHEO. *See id.* Furthermore, the practical effect of the City's position is such that FHFA—an enormous federal agency charged with overseeing the national mortgage program—could never sue or be sued. But HERA and the courts contemplate FHFA's participation in litigation. *See* 12 U.S.C. § 4617(b)(12) (providing statutes of limitations "for any action brought by [FHFA] as conservator or receiver"); *Kellmer v. Raines*, 674 F.3d 848, 850 (D.C. Cir. 2012) (section 4617(b)(2)(A) "plainly transfers shareholders' ability to bring derivative suits . . . to FHFA").[13]

---

[13] In the last few years, FHFA has been sued numerous times by local governments regarding the directive it issued to Fannie and Freddie to cease purchasing mortgages on

Accordingly, the Court concludes that Acting Director Demarco was validly appointed, and had the power to authorize this lawsuit against the City of Chicago. Moreover, as FHFA points out, one of its rights as conservator of Fannie and Freddie is to "perform all functions [of Fannie and Freddie] in the name of [Fannie and Freddie]." 12 U.S.C. § 4617(b)(2)(B)(iii); *see* R. 36 at 24 n.16. This includes asserting and protecting Fannie and Freddie's rights by filing suit. The City's position is inconsistent with FHFA's statutory authority to take actions that are "appropriate to carry on the business of [Fannie and Freddie] and preserve and conserve [their] assets and property." *Id.* § 4617(b)(2)(A)(i). Congress could not have intended for FHFA to take over the business of Fannie and Freddie but then have no ability to seek court action on their behalf.

### III. FHFA's Motion for Summary Judgment

FHFA contends that the remaining arguments raised in the City's motion to dismiss are purely legal issues appropriate for summary judgment. Thus, FHFA filed a cross-motion for summary judgment, which addresses the central issue of preemption and other substantive legal issues that overlap with the City's motion.

---

properties encumbered by liens made under so-called property-assessed clean energy ("PACE") programs, which finance environmental improvements on residential properties. *See Cnty. of Sonoma v. FHFA*, 710 F.3d 987, 989 (9th Cir. 2013); *Town of Babylon v. FHFA*, 699 F.3d 221, 224 (2d Cir. 2012). Ultimately, the Second and Ninth Circuits concluded that they lacked jurisdiction to review FHFA's decision to cease purchasing mortgages on PACE-encumbered properties because the directive was a lawful exercise of FHFA's authority as conservator. Section 4617(f) provides that courts may take no "action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator or a receiver." These courts did not dismiss the actions on the ground that the Director of FHFA could not be sued due to an invalid appointment, nor has FHFA ever taken such a position to the Court's knowledge.

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1996). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Egan Marine Corp. v. Great Am. Ins. Co.*, 665 F.3d 800, 811 (7th Cir. 2011). A nonmovant must produce more than "a mere scintilla of evidence" to defeat summary judgment and "must come forward with specific facts demonstrating that there is a genuine issue for trial." *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010) (quoting *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008)).

The City maintains that discovery is necessary for the City to address the issues central to FHFA's motion for summary judgment. Before the case was assigned to this Court, the City filed two motions for discovery pursuant to Rule 56(d). R. 28, 40. Both motions were denied by the judge previously assigned to this case. R. 31, 46. The Court agrees that discovery is not necessary to decide the preemption issues as they are "purely legal questions . . . [that] can be resolved solely on the basis of the state and federal statutes at issue." *See Wis. Cent. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008).[14]

---

[14] The City did not seek discovery concerning FHFA's allegation that the ordinance imposes an impermissible tax on the federal government. *See* R. 40; R. 77 at 105.

### A. Express Preemption

The doctrine of preemption—rooted in the Constitution's Supremacy Clause—permits Congress to expressly displace state or local law in any given field. *See Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991). "[F]or the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).

Section 4617(a)(7) of HERA provides that "[w]hen acting as conservator or receiver, [FHFA] shall not be subject to the direction or supervision of any other agency of the United States or any State in the exercise of the rights, powers, and privileges of [FHFA]." 12 U.S.C. § 4617(a)(7). The City argues that the Ordinance cannot be invalidated on express preemption grounds because the statutory language of § 4617(a)(7) only includes "agenc[ies] of the United States" and "States"—not local municipalities like the City of Chicago. R. 25-1 at 12. The City also points out that HERA's definition of the term "State" does not reference local government entities. *See* 12 U.S.C. § 4502(22) (the term "State" means "the States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, Guam, the Virgin Islands, American Samoa, the Trust Territory of the Pacific Islands, and any other territory or possession of the United States").

Despite the fact that the terms "local government" or "municipality" do not appear in the text of § 4617(a)(7), or in HERA's definition of "State," FHFA contends

that the term "State" necessarily includes local governments and municipalities because the Ordinance plainly subjects FHFA, as conservator of Fannie Mae and Freddie Mac, to the "direction and supervision" of the City of Chicago in violation of § 4617(a)(7). R.36 at 9; R. 52 at 8-9. FHFA draws support for its position from an analogous statute in the FDIC context, and decisions from other circuit courts.[15] But none of these authorities address the specific issue facing this Court: whether HERA's express preemption of a "State" extends to local governments like the City of Chicago.

FHFA also argues that it "makes little sense to restrict States but not their subdivisions." R. 52 at 4 (citing *Mortier*, 501 U.S. at 616 (Scalia, J. concurring)). This may be true, but express preemption requires Congress to declare its intention to preempt state or local regulations "through a *direct* statement in the text of federal law." *Fifth Third Bank ex rel. Trust Officers v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005) (emphasis added). In *Mortier*, the Supreme Court held that a provision of the Federal Insecticide, Fungicide, and Rodenticide Act authorizing a "State [to] regulate the sale or use of any federally registered pesticide or device in the State," did not invalidate local pesticide regulations, concluding that "mere silence cannot suffice to establish a clear and manifest purpose to pre-empt local authority." 501 U.S. at 602, 607. Accordingly, because the express language of § 4617(a)(7) does not contain any reference to local or municipal laws, HERA does not expressly preempt the Ordinance.

---

[15] In *Aux Sable v. Murphy*, the Seventh Circuit declined to decide whether the Surface Transportation Assistance Act, 49 U.S.C. § 31114, which is limited to "States," expressly preempts "local governments." 526 F.3d 1028, 1033-34 n.3 (7th Cir. 2008).

FHFA contends that in *City of Columbus v. Ours Garage & Wrecker Service*, 536 U.S. 424 (2002), the Supreme Court applied the principle from *Mortier* in its favor, when it held that an exception to a statute's preemption clause that expressly saved state laws but was silent with regard to local laws, nevertheless saved local laws as well. FHFA argues that because other provisions of HERA expressly join state and local governments "Congress did not intend to distinguish between States and localities in terms of the reach of the statute, and intended that any provision that restricts . . . state government necessarily applies to . . . municipalities." R. 52 at 7-8. But FHFA's interpretation ignores the Supreme Court's reasoning that "[a]bsent a basis more reliable than statutory language insufficient to demonstrate a 'clear and manifest purpose' to the contrary, federal courts should resist attribution to Congress of a design to disturb" state and local statutes. *City of Columbus*, 536 U.S. at 439. Due to HERA's lack of reference to local governments in its preemption clause, the statutory language alone is insufficient to demonstrate a clear and manifest purpose to preempt the Ordinance.[16]

## B. Implied Preemption

Even in the absence of express preemption language, preemption may be implied.

Implied preemption comes in two types: (1) field preemption, which arises when the federal regulatory scheme is so pervasive or the federal interest so dominant that it may be inferred that Congress intended to occupy the entire

---

[16] FHFA's reliance on *American Trucking*, 133 S. Ct. 2096, R. 77 at 94, is also misplaced. The federal statute at issue in *American Trucking*, 49 U.S.C. § 14501(c)(1), expressly includes "political subdivisions" in the scope of its preemption clause, 133 S. Ct. at 2100-01, and so is contrary to FHFA's argument here where HERA's preemption clause does not expressly include local governments.

legislative field; and (2) conflict preemption, which arises when state law conflicts with federal law to the extent that "compliance with both federal and state regulations is a physical impossibility," or the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Planned Parenthood of Ind. v. Comm'r of Ind. State Dept. of Health*, 699 F.3d 962, 984 (7th Cir. 2012) (quoting *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012)).

### 1. Field Preemption

FHFA argues that HERA occupies the field with regard to the supervision and regulation of Fannie Mae and Freddie Mac. Through HERA, Congress conferred broad authority on FHFA to exercise its discretion in supervising Fannie Mae and Freddie Mac's business operations. It is crucial to remember that FHFA is contesting the Ordinance as it applies to FHFA's position as conservator of Fannie and Freddie and that—on its own behalf and on behalf of Fannie and Freddie— FHFA is seeking a declaratory judgment that FHFA "is statutorily immune from the ordinance as it applies to *mortgagees or obligees*." *See* R. 1 at 22 (emphasis added).[17] As conservator, FHFA has broad powers to operate Fannie and Freddie

---

[17] Whether the ordinance is, in fact, proper as applied to owners is not the subject of FHFA's motion, and the Court expresses no opinion on this issue. Nevertheless, FHFA contends that the City's police power to regulate *owners* of vacant properties is likely permissible, while regulation of FHFA, as appointed conservator and *mortgagee* of vacant properties it does not own, is not. The City agrees with this contention, in part. In its surreply, the City stated that it "does not disagree" with FHFA's assertion "that there is a difference between owners and mortgagees." R. 57-1 at 7. The City states that the difference between the two categories "is why the City's requirements applicable to mortgagee(s) of a vacant building are much more limited than the City's requirements applicable to the owner(s) of the same vacant building." *Id.* For example, the Ordinance provides mortgagees with eight affirmative defenses they can assert in response to being found in violation of the ordinance, including an opportunity to cure the alleged violation within 30 days of receiving written notice of the violation. *See* Municipal Code of Chicago § 13-12-126(c). Since owners of property, and not mortgagees, are generally responsible for compliance with land use regulations, the City's admission that the Ordinance

21

and do what it sees fit to "preserve and conserve [their] assets." *See* 12 U.S.C. §§ 4617(c)(2), (b)(2)(D)(ii). Significantly, HERA's preemption provision is included in § 4617, the same section that (1) authorizes the Director of FHFA to appoint FHFA as conservator, and (2) sets forth the conservator's general powers, including its power to operate Fannie and Freddie and succeed title to their assets. *Id.* § 4617(a)(2), (b)(2). HERA's provisions make it clear that, in the event Fannie and Freddie were placed into conservatorships, Congress intended FHFA to assume complete control of those regulated entities and, in its discretion, "take such action as may be necessary to put the regulated entity in a sound and solvent condition." *Id.* § 4617(b)(2)(D)(i). Thus, FHFA correctly asserts that "[w]ith respect to the maintenance of collateral by [Fannie and Freddie] in conservatorship, HERA plainly occupies the field." R. 52 at 14.

The City's ultimate argument against preemption is that the ordinance is a local land use law authorized by traditional police powers and "there is a presumption against finding preemption in cases involving the traditional exercise of police powers by local government entities." R. 25-1 at 18 (citing *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) ("'[I]n all pre-emption cases . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"

---

distinguishes between owners and mortgagees belies the City's argument that the Ordinance, as applied to mortgagees, is a land use regulation.

(quoting *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996)))); see also R. 57-1 at 6-10.[18] Thus, the City contends that this "presumption," in combination with the fact that HERA's language omits reference to local or municipal laws, serves to prevent the Court from finding that HERA preempts the Ordinance under an implied preemption analysis. R. 25-1 at 18.

FHFA disputes that the Ordinance qualifies as a land use regulation.[19] Indeed, it is not clear that the nature of the Ordinance is relevant at all.[20] But even assuming the Ordinance is a land use regulation, and that this categorization is relevant to the Court's preemption analysis, the City's argument that the Ordinance is not preempted as a valid land use regulation is unpersuasive. The City cites *City*

---

[18] FHFA propounds a more in-depth response to the City's argument regarding land use laws in its reply brief in support of its motion for summary judgment. *See* R. 52. The City objected to this portion of FHFA's reply brief, arguing that FHFA impermissibly raised new issues when it had agreed to confine its reply to matters raised in its motion for summary judgment. *See* R. 57. Although the City "recognized that its motion to dismiss and FHFA's motion for summary judgment overlap to some degree and share certain broad themes such as the intention and reach of HERA [and] principles of federal preemption," it asked the judge previously assigned to this case to grant the City leave to file a surreply, or, in the alternative, strike those portions of FHFA's reply that address the City's motion to dismiss. *Id.* The previous judge granted the City leave to file a surreply, and stated that "[i]n ruling on the pending motions, the court will consider defendant's sur-reply concerning only any new argument raised in plaintiff's reply." R. 61. This Court will do the same.

[19] FHFA asserts that the City's "goal in enacting the ordinance is to shift costs from the City to the mortgages including the [government-sponsored enterprises] in conservatorship, which are being supported by U.S. taxpayers." R. 52 at 9.

[20] Although courts have declined to preempt "traditional state police powers" in certain contexts, "the pivotal question is not the nature of the state regulation, but the language and congressional intent of the specific federal statute." *City of Auburn v. United States*, 154 F.3d 1025, 1031 (9th Cir. 1998); *see also Medtronic*, 518 U.S. at 485 ("the purpose of Congress is the ultimate touchstone in every pre-emption case") (quotation omitted). In any event, courts are to "start with the assumption" against preemption in "*all* pre-emption cases," not just those cases that concern "a field which the States have traditionally occupied." *Wyeth*, 555 U.S. at 565 (emphasis added). Thus, whether the Ordinance is a land use regulation, as the City contends, does not affect the Court's analysis.

*of Joliet v. New West*, 562 F.3d 830 (7th Cir. 2009), in support of its argument because in that case the Seventh Circuit held that a municipality's power of eminent domain was not preempted by the Fair Housing Act. The Seventh Circuit considered the issue of "whether a state or local law can be preempted by the 'findings' and 'purposes' clauses of a federal statute, even though the state or local law does not conflict with any rule of law established in the federal statute." *Id.* at 834-35. The Seventh Circuit found the United States Department of Housing and Urban Development's ("HUD") failure to point to a "clear statement" of national decision to prevent the city from using its power of eminent domain to condemn low-income housing to be "telling." *Id.* at 836. HUD's only contention was that the City of Joliet's condemnation of the building would "interfere with national goals." *Id.*

Here, in contrast, it is evident that the Ordinance encroaches on an area of regulation that Congress reserved exclusively for FHFA. As applied to FHFA as conservator and mortgagee, the Ordinance regulates how FHFA manages its collateral, including specifically how this collateral—which FHFA does not actually own—should be preserved. For instance, when FHFA issues guidelines and instructions to servicers regarding the nature and frequency of inspections of vacant and abandoned properties, it is taking those steps it believes necessary to preserve and conserve Fannie and Freddie's assets and property.

HERA expressly prohibits other federal agencies and states from interfering with actions taken by FHFA as conservator. 12 U.S.C. § 4617(a)(7). Although HERA's preemption provision, § 4617(a)(7), does not expressly include laws enacted

24

by municipalities, "[t]he question whether the regulation of an entire field has been reserved by the Federal Government is, essentially, a question of ascertaining the intent underlying the federal scheme." *Hillsborough*, 471 U.S. at 714. In this case, Congress enacted an extensive federal statutory scheme which specifically requires the Director of FHFA to "establish risk-based capital requirements for [Fannie and Freddie] to ensure that [they] operate in a safe and sound manner, maintaining sufficient capital and reserves to support the risks that arise in the operations and management of [Fannie and Freddie]." 12 U.S.C. § 4611(a). HERA sets forth various grounds for the Director of FHFA to exercise his discretion to appoint FHFA as conservator of Fannie and Freddie. *Id.* § 4617(a)(3). Once placed in conservatorship, Congress intended for FHFA to be the sole entity responsible for operating Fannie and Freddie's nationwide business of purchasing and securitizing mortgages. *Id.* § 4617(a)(7).

The City makes much of the fact that HERA was not enacted until 2008, and thus argues that it is "absurd" to compare the federal regulation of Fannie and Freddie to the historic and pervasive federal regulation of national banks and maritime commerce, which are the subject of *Barnett Bank of Marion County v. Nelson*, 517 U.S. 25 (1996), and *United States v. Locke*, 529 U.S. 89 (2000). R. 37 at 16. But the City fails to explain why the statute's short history is a factor that should be given more weight than the text and intent of the statute itself.

The City claims that it is not regulating FHFA's business of "mortgage lending," but rather, the Ordinance is confined to the "regulation of local

properties." R. 77 at 82. The Court disagrees. The Ordinance clearly requires FHFA to register and monitor all of the vacant residential buildings for which it is "mortgagee." The Ordinance thus imposes obligations on FHFA with respect to its assets and security interests despite Congress' intent for FHFA to act as conservator and operate Fannie and Freddie until they are stabilized. Looking at the statutory text and purpose of HERA, it is evident that Congress intended for FHFA to possess exclusive authority over Fannie and Freddie's business operations—including their management of the homes in which they have a security interest. Indeed, those homes, or their interest in them, are the most important assets Fannie and Freddie have.

Accordingly, the Court concludes that the Ordinance is preempted by field preemption. In enacting HERA, Congress could not have intended to preclude other federal agencies and states from regulating FHFA's operations, but permit thousands of municipalities all over the country to impose varying ordinances and obligations on FHFA. Such a result would invite chaos, as FHFA would be subject to a variety of potentially conflicting ordinances, raising the expenses of FHFA in not only complying with those ordinances, but in simply monitoring the various requirements. Congress could not have intended such a result, especially when the overall goal of HERA was to preserve the assets of Fannie Mae and Freddie Mac. This is not to say that FHFA can let properties where it is the mortgagee become decrepit. Fannie and Freddie's own guidelines, not unlike the City's, require it to maintain the properties in a manner to preserve their value. This is consistent with

their overall mandate to preserve the assets of Fannie and Freddie—a field into which the City of Chicago may not encroach.

### 2. Conflict Preemption

"The Supreme Court has 'found implied conflict pre-emption where' either (1) 'it is impossible for a private party to comply with both state and federal requirements,' or (2) 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 577-78 (7th Cir. 2012) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)); *see also Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002) ("Congress' inclusion of an express pre-emption clause does not bar the ordinary working of conflict preemption principles") (quotation omitted). Here, FHFA argues that the Ordinance plainly stands as an obstacle to the objectives of HERA. R. 36 at 15.

As conservator, FHFA issues specific supervisory directives to Fannie Mae and Freddie Mac. *See, e.g.*, R. 36-5. For instance, in April 2011, FHFA directed Fannie and Freddie "to align their guidelines for servicing delinquent mortgages they own or guarantee" in an effort to "establish uniform servicing requirements as well as monetary incentives for servicers that perform well and penalties for those that do not." *Id.* Fannie Mae's 2012 Servicing Guide instructs servicers to "take whatever action is necessary to protect the value of the property . . . includ[ing] making sure that no apparent violations of applicable law are occurring on the property (such as violations of laws relating to illegal narcotics and similar

substances) and that the property is protected against vandals and the elements." R. 36-4 § 108. If the cost of property preservation work exceeds the allowable amounts set forth in Fannie Mae's "property preservation matrix and reference guide," the servicer must submit its request for repair to Fannie Mae, who will then make a "sound property preservation decision." *Id.*

The City argues that there is no conflict preemption here because the guidelines approved by FHFA are "substantially the same" as the maintenance required under the Ordinance. R. 37 at 18. The City also points out that FHFA's guidelines set different standards for servicers in the various states—*e.g.*, servicers must cut the grass between April and October for properties located in Illinois, whereas the grass must be cut year-round for properties in Arizona. The City contends that by imposing some requirements based on the state in which the property is located, FHFA undercuts its own argument that Congress intended for FHFA to have "uniform national regulation." R. 37 at 19.

The fact that there may be some overlap between FHFA's guidelines and the requirements imposed under the Ordinance does not end the conflict preemption inquiry. Rather, the Court must consider whether the City's regulation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade*

*Council*, 530 U.S. 363, 372 n.6 (2000) (noting that "the categories of preemption are not 'rigidly distinct'" (quoting *English v. General Elec. Co.*, 496 U.S. 72, 79, n. 5 (1990)). Thus, the Court's task is similar to its analysis of the other form of implied preemption: field preemption. As already discussed, it is evident that Congress intended for FHFA to possess exclusive authority over Fannie Mae and Freddie Mac's business operations—including their management of the homes in which they have a security interest.

Because the Ordinance obstructs Congress's intent to have one conservator take control of Fannie Mae and Freddie Mac, and take action as may be "appropriate to carry on [their business] and preserve and conserve [their] assets and property" without being "subject to the direction or supervision of any other agency of the United States or any State," 12 U.S.C. § 4617(b)(2)(D)(ii), the Court concludes that conflict preemption also exists in this case.

### C. Fees, Fines, and Penalties

The Ordinance as applied to FHFA is preempted by HERA, and the Court's holding on this issue is sufficient to grant FHFA's motion for summary judgment. Nonetheless, for purposes of completeness, the Court will address FHFA's allegations that the registration fee and the fines and penalties imposed by the Ordinance violate FHFA's immunity from such charges.

Since "the power to tax involves the power to destroy," *McCulloch v. Maryland*, 7 U.S. 316, 431 (1819), the Supreme Court "has never questioned the propriety of absolute federal immunity from state taxation." *United States v. New*

*Mexico*, 455 U.S 720, 730 (1982). "[I]n passing on the constitutionality of a state tax [courts are to be] concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it." *City of Detroit v. Murray Corp. of Am.*, 355 U.S. 489, 492 (1958) (internal quotation and citation omitted). "Consequently in determining whether [certain] taxes violate the Government's constitutional immunity [courts] must look through form and behind labels to substance." *Id.* Accordingly, in distinguishing impermissible state taxes from permissible fees, the Seventh Circuit has "emphasized the revenue's ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays the agency's cost of regulation." *Hager v. City of West Peoria*, 84 F.3d 865, 870 (7th Cir. 1996) (citing *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992)).[21]

The City contends that a governmental charge is a "tax" when its "essential purpose," R. 37 at 22-23, is "the benefit of the entire community," and is a "fee"

---

[21] The Seventh Circuit authority construing the difference between "taxes" and "fees" arises in the context of the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, which prohibits federal courts from interfering with the collection of state taxes. FHFA questions the relevance of such authority to the issue presented here regarding the federal government's tax immunity, arguing that "courts interpreting the TIA would take a narrow view of what constitutes a tax," R. 52 at 22, in order to avoid disrupting states' ability to generate revenue. *See Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722, 733-34 (7th Cir. 2011). But contrary to FHFA's contention, courts concerned with protecting states' revenue generation under the TIA should take a broad view of what constitutes a tax, since taxes are what the TIA protects. FHFA's objection is, thus, of no moment, since a broad view of what constitutes a tax works in FHFA's favor here. In any event, the Court sees no reason why the authority from the TIA context should not serve as a guide here. The parties have not cited any Seventh Circuit authority construing the difference between "taxes" and "fees" in the federal tax immunity context, and the Court has not discovered any. Thus, the Court will apply the standards set forth by the Seventh Circuit in the TIA context.

when its "essential purpose" is "regulatory . . . such as making undesired conduct expensive or raising money to defray regulation costs." R. 25-1 at 22-23. The City states that the registration fee is "connected to the City's cost of monitoring vacant properties and the follow-up inspections for compliance," R. 25-1 at 23, and is "imposed to discourage the proliferation of vacant buildings and off-set the costs such buildings inflict on the City." R. 37 at 20.[22] FHFA contends that the registration fee is a tax because "the City is not providing a service to [FHFA] or any other mortgagee responsible for paying the registration charge. Moreover, there is no evidence that [FHFA has] caused the 'costs' traceable to vacant properties." R. 52 at 23; *see also* R. 36 at 20.

The Court finds that the registration fee required by the Ordinance is an impermissible tax on the federal government, because the revenue from the registration fee "does not go to pay for some service that [the City] renders to [FHFA], or . . . to some service that is required by the existence of [FHFA]." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722, 733 (7th Cir. 2011).[23] The City's monitoring of vacant properties is not a service the City "renders to" FHFA, but is an action the City undertakes to benefit City residents in

---

[22] Indeed, the parties agree that vacant buildings cause serious problems for the City of Chicago and its residents. *See* R. 77 at 35. The Court agrees with this obvious fact.

[23] The City contends that the federal government's tax immunity is not at issue because the registration fee "is paid by the mortgage servicers, not by Fannie, Freddie, or FHFA, and as a matter of law, private parties are not exempt from taxes on their economic activity, even if a tax-exempt federal entity reimburses them for those taxes." R. 37 at 20. This argument is meritless as FHFA, as mortgagee, is directly responsible for the registration fee under the express terms of the Ordinance. *See* Municipal Code of Chicago § 13-12-126(a)(1) ("The *mortgagee* . . . shall . . . file a registration statement . . . and pay a registration fee of $500.00.") (emphasis added).

general. Further, FHFA's "existence" does not cause properties to be vacant, and vacant properties are not a necessary aspect of FHFA's participation in the mortgage market. Although, as discussed above with regard to preemption, the Ordinance regulates FHFA's mortgage business by impermissibly imposing obligations on FHFA as a mortgagee with respect to how it maintains its assets and security interests, the revenue generated by the registration fee ultimately is not used to regulate the lending activities of FHFA and other mortgagees. *Cf. San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of Puerto Rico*, 967 F.2d 683 (1st Cir. 1992) (holding that a fee charged to telecommunications companies was not a tax because it was used to offset the cost of telecommunications regulation). Rather, the revenue generated by the City's registration fee pays for the costs associated with vacant buildings. But FHFA is not in the vacant buildings business, and the existence of vacant buildings is merely incidental to FHFA's role in the mortgage lending business. *See Empress Casino*, 651 F.3d at 733 ("The casino tax goes to subsidize racetracks . . . . It is . . . an example of a state's taking money from one group of firms and giving it to another group . . . ."). Therefore, the registration fee is a tax that violates FHFA's immunity to taxation.[24]

The City contends that the registration fee cannot be a tax because "the fee does not arise from the mortgagees' status as mortgagees but from their status as parties who have failed to be responsible for vacant, neglected property in need of

---

[24] FHFA does not allege that any provision of the Ordinance other than the registration fee (such as the property maintenance requirements) constitutes an impermissible tax. *See* R. 52 at 1 ("Moreover, the so-called 'Registration Fee,' a thinly disguised tax, is barred for the second, independent reason that HERA and the Enterprises' Congressional charters prohibit the imposition of taxes.").

maintenance, repair or securing." R. 25-1 at 23. The Court questions whether a security interest is a sufficient legal basis for the City Council to legislate that mortgagees are "responsible" for vacant property.[25] In any event, the City's purported creation of such a responsibility does not alter the salient facts (discussed above) that FHFA does not receive any service from the City in exchange for the registration fee, and that vacant property is not a necessary consequence of FHFA's mortgage lending business. Thus, it is not permissible for the City to require FHFA to bear the costs associated with the City's regulation of vacant buildings.[26]

Lastly, HERA also provides that the Conservator "shall not be liable for any amount in the nature of penalties or fines, including those arising from the failure of any person to pay any real property, personal property, probate, or recording tax or any recording or filing fees when due." 12 U.S.C. §§ 4617(j)(1), (4). The Ordinance provides that "[a]ny person who violates any provision of this section or of the rules and regulations issued hereunder shall be fined not less than $500.00 and not more than $1,000.00 for each offense." Municipal Code of Chicago § 13-12-126(c). FHFA alleges that this provision of the Ordinance as applied to FHFA violates HERA's

---

[25] *See, e.g.*, *Hausman v. Dayton*, 653 N.E.2d 1190, 1196 (Ohio 1995) ("[A] mortgage of real property is a security for a debt and gives the mortgagee no right of possession or control. A mortgagee, then, has no ability to create or prevent a nuisance from arising on the mortgaged property, and to hold such a mortgagee liable for abatement would be arbitrary and thus unconstitutional.").

[26] The City also contends that the registration fee is not a tax "because it is administered by the agency responsible for the condition of buildings and aims to encourage the security and integrity of vacant, neglected buildings." R. 25-1 at 23. The City cites no precedent stating that this is a relevant factor. In any event, this fact does not outweigh the "ultimate use" of the registration fee, as discussed above. *See Hager*, 84 F.3d at 870; *Empress Casino*, 651 F.3d at 733.

prohibition on fines and penalties assessed against the Conservator, and the Court agrees.

The City does not dispute that 12 U.S.C. § 4617(j)(4) exempts FHFA from fines and penalties. *See* R. 25-1 at 22 n.26; R. 37 at 25 n.34. The City contends that any fines and penalties are actually assessed against "Fannie and Freddie," R. 25-1 at 22 n.26, or "the servicers," R. 37 at 25 n.34, and, thus, are not barred by § 4617(j)(4). As explained earlier, these contentions are meritless. FHFA, as conservator, stepped into the shoes of Fannie Mae and Freddie Mac. *See* 12 U.S.C. § 4617(b)(2)(A)(i). And the Supreme Court's reasoning in *American Trucking*, 133 S. Ct. at 2104, which the Court discussed with respect to preemption, applies equally here to prohibit fines and penalties that may be charged to the servicers and passed on to FHFA.

## Conclusion

For the reasons stated above, the City's motion to dismiss, R. 24, is denied, and FHFA's motion for summary judgment, R. 34, is granted.

ENTERED:

*Thomas M. Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: August 23, 2013